**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

PHOENIX PETROLEUM CO.,

        **Plaintiff,**

v.                         **//    CIVIL ACTION NO. 1:04CV128**
                                         **(Judge Keeley)**

ST. MARY'S REFINING CO.,

        **Defendant.**

### ORDER DENYING CROSS SUMMARY JUDGMENT MOTIONS BY PHOENIX AND ST. MARY'S AND GRANTING IPCO'S MOTION FOR SUMMARY JUDGMENT

This matter is pending on the competing motions for summary judgment of plaintiff Phoenix Petroleum Co. ("Phoenix"), defendant St. Mary's Refining Co. ("St. Mary's"), and third-party defendant International Petroleum Co. ("IPCO"), and following oral argument on the issues of contract interpretation raised by the parties. Because the contract among the parties is ambiguous on the questions of what constitutes a loss and how loss should be calculated, the Court **DENIES** Phoenix's partial summary judgment motion and St. Mary's summary judgment motion. Based on IPCO's arguments of its rights and obligations under the contract, the Court **GRANTS** IPCO's motion for summary judgment and **DISMISSES** it **WITH PREJUDICE** from this case. The Court also **DENIES-IN-PART** and **GRANTS-IN-PART** Phoenix's motion to strike affirmative defenses.

### ORDER DENYING CROSS SUMMARY JUDGMENT MOTIONS
### BY PHOENIX AND ST. MARY'S AND GRANTING IPCO'S
### MOTION FOR SUMMARY JUDGMENT

### I. PROCEDURAL HISTORY AND STATEMENT OF RELEVANT FACTS

On August 11, 1995, Phoenix, St. Mary's, and IPCO entered into a written Processing Agreement ("Agreement"), establishing a business venture relating to the purchase, processing, sale and marketing of processed demetallized lube oil into marketable lube oils. The Agreement was discussed and negotiated by all parties and drafted by counsel for St. Mary's.

Paragraph One of the Agreement addressed the type of relationship entered into by the parties and stated that the contractual relationship between the parties should not be interpreted as creating "an agency or as a joint venture association, partnership or other business entity," except as specifically described in the Agreement.

The Agreement also delegated specific duties and financial obligations to each party. Paragraphs Three and Four provided the specific contractual duties and financial obligations of Phoenix, IPCO[1], and St. Mary's in the business venture. Paragraph Three stated:

---

[1] IPCO is referred to as Interpet in the Processing Agreement at issue in this litigation.

**ORDER DENYING CROSS SUMMARY JUDGMENT MOTIONS
BY PHOENIX AND ST. MARY'S AND GRANTING IPCO'S
MOTION FOR SUMMARY JUDGMENT**

3.    RESPONSIBILITY OF PHOENIX AND INTERPET. Phoenix and/or Interpet will purchase and deliver feedstock to process through the hydrotreater at SMRC, and market the finished hydrotreated product. Phoenix and/or Interpet will be responsible for and pay all expense for the marketing, sale, and delivery of such product. Phoenix and/or Interpet will diligently and in accordance with applicable law invoice customers and collect payments. Phoenix and/or Interpet will arrange all lines of credit and provide all necessary working capital in connection with the purchase, delivery, processing and sale of feedstock and finished product.

Paragraph Four stated:

4. RESPONSIBILITY OF SMRC. SMRC will modify and convert its catalytic reformer into a hydrotreater and, if required, will build the aforesaid pipeline. SMRC will operate the hydrotreater and process into finished lube base oil all feedstock Phoenix and/or Interpet delivers to SMRC. SMRC will provide all necessary terminal, storage and blending facilities for feedstock and finished product. SMRC will pay all expenses associated with operating, maintaining and repairing the hydotreater, all expenses associated with providing terminalling, storage and blending services and all costs of operating and maintaining its refinery, including all environmental, monitoring, cleanup and remediation costs.

Under Paragraphs Five, Six, and Seven, St. Mary's was also entitled to additional monies from Phoenix and/or IPCO as follows:

5.    PROCESSING FEE TO SMRC.    For providing hydrotreating services, and storage, terminalling, blending and other services related to processing the feedstock brought to the refinery by Phoenix and/or Interpet into commercially saleable finished lube oil, SMRC will receive a processing fee equal to: (a) the direct costs of providing these services including any costs incurred as a result of feedstock provided by

Phoenix/Interpet that must be reprocessed or which causes damage to the hydrotreater; plus (b) one-half the profit derived by Phoenix and/or Interpret from the sale of the hydrotreated product; and plus (c) any other mutually agreed upon charge to cover any other direct costs or increase in direct plant operating costs over levels existing as of the date of this Agreement.

6. WEEKLY PROCESSING PAYMENTS TO SMRC. Each week, Phoenix and/or Interpet, upon receipt of invoice therefor, will pay SMRC an amount equal to $.12 per gallon of feedstock processed through the hydrotreater (and going to finished product storage) during the previous week. Each month, SMRC will submit an invoice for all actual processing fees owing SMRC for the previous month, and Phoenix and/or Interpet will pay SMRC the amount of such invoice within five business days of receipt of invoice, less than any amounts previously paid.

7. ADDITIONAL PROCESSING FEE TO SMRC. In consideration of the costs to be incurred by SMRC to modify its catalytic reformer and to build the pipeline to the Ohio River, SMRC will receive as first call on Gross Profit (as calculated in accordance with attached Exhibit 1) an additional fee of $0.06 for every gallon of hydrotreated product going to storage from the hydotreater, but in no event more than $208,000 per year, until SMRC has received an amount equal to 150% of its costs in modifying its reformer and building such pipeline, plus interest on such amount calculated at a fluctuating annual interest rate equal to the prime rate of Mellon Bank, N.A., plus 1% annum. Progress payments will be made to SMRC quarterly within 15 days of the close of each calendar quarter based on invoice amounts. The payment for the last calendar quarter will be paid within 15 days after the issuance of the year-end Profit and Loss Statement, and adjustments will be made for any accounts receivable that were included in previous

**ORDER DENYING CROSS SUMMARY JUDGMENT MOTIONS
BY PHOENIX AND ST. MARY'S AND GRANTING IPCO'S
MOTION FOR SUMMARY JUDGMENT**

progress payments and subsequently charged off as uncollectible.

Several provisions of the Agreement discuss the accounting and financial arrangement agreed to by the parties. Paragraph Nine of the Agreement required, for example, that the parties maintain accounting records and freely exchange all sales expenses and other documents relating to their individual obligations. It also directed Phoenix to produce a Profit and Loss Statement in the form set forth in Exhibit 1 attached to the Agreement. Exhibit 1 provided a formula/method by which Phoenix was required to calculate the "venture profit" and produce a Profit and Loss statement.

Significantly, Paragraph 10 of the Agreement stated:

10. DIVISION OF PROFIT AND LOSS. <u>Profit and losses will be divided equally</u> between SMRC and Phoenix/Interpet as soon as practicable after the issuance of the Profit and Loss Statement for each quarter. In the event there is a loss in any quarter, unless there is a mutual written agreement to continue, operations will cease within 30 days and will not re-start until the parties agree in writing. Except as otherwise provided in this Agreement, each party will be responsible for its own overhead. However, Phoenix/Interpet will pay for all its own internal marketing costs (i.e. salaries, travel) and not include them for purpose of Exhibit 1.

(emphasis added).

5

### ORDER DENYING CROSS SUMMARY JUDGMENT MOTIONS BY PHOENIX AND ST. MARY'S AND GRANTING IPCO'S MOTION FOR SUMMARY JUDGMENT

Finally, Paragraph 13 addressed the term of the Agreement and stated that, in the event of termination, Phoenix and IPCO would immediately pay to SMRC the balance due under Paragraph 7. The parties also agreed to cooperate to wind down the business as quickly as possible.

Although their business venture lost money from its inception, the parties continued operations until October 1997 when St. Mary's finally initiated the termination of the venture through a written letter. Ultimately, the parties agreed to wind up business operations as of November 1997. On November 4, 1997, Phoenix demanded payment from St. Mary's of $153,331.81, the amount it contends is half of the venture's losses. St. Mary's has refused to pay any percentage of the losses, arguing that, under the Agreement, it was not required to share in those losses.

On June 23, 2004, Phoenix sued St. Mary's in this Court to collect half of the venture's losses allegedly owed by St. Mary's pursuant to Paragraph 10 of the Agreement. On August 2, 2004, St. Mary's answered the suit, denying any breach of the Agreement. Moreover, in its affirmative defenses, St. Mary's asserted that Phoenix and IPCO had failed to fulfill their contractual obligations to St. Mary's, and that if any damages are recoverable

## ORDER DENYING CROSS SUMMARY JUDGMENT MOTIONS BY PHOENIX AND ST. MARY'S AND GRANTING IPCO'S MOTION FOR SUMMARY JUDGMENT

by Phoenix, they should be offset by the outcomes in two prior civil cases in the Circuit Court of Pleasants County and Ohio County, both of which ended in settlement.

On August 13, 2004, St. Mary's filed a third-party complaint against IPCO, seeking contribution and maintaining that Phoenix and IPCO had breached their duties under the contract by failing to obtain economic qualities and quantities of feedstock, failing to market the product, and selling the product to themselves or other entities they controlled.[2] IPCO's answer denied that it owed St. Mary's any contribution with respect to Phoenix's contract claims, and admitted that it had assigned all of its contractual rights under the Agreement to Phoenix.

### II. STANDARD OF REVIEW

A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists "if the evidence is such

---

[2] On August 16, 2005, pursuant to Federal Rule of Civil Procedure 15(a), St. Mary's filed an amended third party complaint against IPCO. This amendment attached exhibits inadvertently omitted from the initial complaint.

**ORDER DENYING CROSS SUMMARY JUDGMENT MOTIONS
BY PHOENIX AND ST. MARY'S AND GRANTING IPCO'S
MOTION FOR SUMMARY JUDGMENT**

that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). In considering a motion for summary judgment, the court is required to draw reasonable inferences from the facts in a light most favorable to the nonmoving party. Id. at 255.

The moving party has the burden of initially showing the absence of a genuine issue concerning any material fact. Adickes v. S. H. Kress & Co., 398 U.S. 144, 159 (1970). Once the moving party has met its initial burden, the burden shifts to the nonmoving party to "establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). To discharge this burden, the nonmoving party cannot rely on its pleadings but instead must have evidence showing that there is a genuine issue for trial. Id. at 324.

### III. ANALYSIS

**A. Phoenix and St. Mary's Cross Motions for Summary Judgment**

**1.  Interpretation of Contract**

The central issue in this case is whether, pursuant to the language of Paragraph 10, the parties' Agreement required them to equally share the venture's losses. The parties do not dispute that

they had agreed to divide equally the "venture profit." Indeed, Exhibit 1 provided a specific formula by which Phoenix was to determine the "venture profit" and expressly stated that "venture profit" was to be divided equally between St. Mary's and Phoenix/IPCO. The parties, however, disagree about what contractual obligation, if any, is created by paragraph 10 with respect to the "division" of "losses."

An established principle of contract law dictates that "a valid written agreement using plain and unambiguous language is to be enforced according to its plain intent and should not be construed." Dawson v. Norfolk and Western Ry. Co., 475 S.E.2d 10 (W.Va. 1996). Simply put, where provisions in a contract are clear and unambiguous, they are to be applied without resort to rules of construction. Columbia Gas v. Nemours, 217 S.E.2d 919 (W.Va. 1975). Furthermore, a contract is not ambiguous merely because the parties disagree as to the meaning of the language they used to express their agreement. Syl. Pt. 1, International Nickel Co., Inc., v. Commonwealth Gas Corp., 163 S.E.2d 677 (W.Va. 1968); Millville Quarry, Inc., v. Liberty Mut. Fire Ins. Co., 43 F. Supp. 2d 580 (N.D. W.Va. 1999). Finally, the question of whether a contract is

ambiguous is one of law. <u>Moore Bros. Co. v. Brown & Root, Inc.</u>, 207 F.3d 717, 726 (4th Cir. 2000).

"Ambiguity in a statute or other instrument consists of susceptibility of two or more meanings and uncertainty as to which was intended. Mere informality in phraseology or clumsiness of expression does not make it ambiguous, if the language imports one meaning or intention with reasonable certainty." <u>Toppings v. Rainbow Homes, Inc.</u>, 490 S.E.2d 817, 822 (quoting Syllabus Pt. 13, <u>State v. Harden</u>, 58 S.E. 715 (W.Va. 1907)). A contract is generally found to be ambiguous if the contract terms are inconsistent on their face or where the terminology can support reasonable differences of opinion as to the meanings of the words utilized and obligation undertaken in light of the surrounding circumstances and after applying the established rules of construction. <u>FOP, Lodge Number 69 v. City of Fairmont</u>, 468 S.E.2d 712, 716 (W.Va. 1996).

Several paragraphs of the Agreement set forth specific financial obligations of each party. Paragraph Three, for example, required Phoenix and IPCO to pay all expenses for the marketing, sale and delivery of the finished hydrotreated product. It also required Phoenix and IPCO to arrange all lines of credit and provide all necessary working capital in connection with the

**ORDER DENYING CROSS SUMMARY JUDGMENT MOTIONS
BY PHOENIX AND ST. MARY'S AND GRANTING IPCO'S
MOTION FOR SUMMARY JUDGMENT**

purchase, delivery, processing and sale of feedstock and finished product.

Paragraph Four, on the other hand, required St. Mary's to pay all expenses associated with operating, maintaining, and repairing the hydrotreater, all expenses associated with providing terminalling, storage and blending services and all costs of operating and maintaining its refinery, including all environmental, monitoring, cleanup and remediation costs.

Other paragraphs of the Agreement created specific financial obligations running from Phoenix/IPCO to St. Mary's. Specifically, Paragraph Five required that a processing fee be paid to St. Mary's in an amount equal to $0.12 per gallon of feedstock processed through the hydrotreater and going to finished product storage each week. The Paragraph Five processing fee was to be paid to St. Mary's in consideration for providing hydrotreating services, and storage terminalling, blending, and other services related to processing the feedstock brought to the refinery by Phoenix and IPCO into commercially saleable finished lube oil. Similarly, Paragraph Seven required that St. Mary's receive an additional processing fee in the form of a first call on Gross Profit of an additional $0.06 for every gallon of hydrotreated product going to

11

**ORDER DENYING CROSS SUMMARY JUDGMENT MOTIONS
BY PHOENIX AND ST. MARY'S AND GRANTING IPCO'S
MOTION FOR SUMMARY JUDGMENT**

storage from the hydrotreater. The additional processing fee was given to St. Mary's in consideration of the costs it incurred to modify the catalytic reformer. These paragraphs establish a specific method through which costs and expenses are allocated between and recovered by the parties. None, however, specifically addresses how these costs and expenses are to be handled in conjunction with the "division" of "losses" required by Paragraph 10.

According to Paragraph 10, "[p]rofit and losses will be divided equally between SMRC and Phoenix/Interpet [IPCO]..." Clearly, when read in the context of the entire Agreement, Paragraph 10 unambiguously establishes that the parties agreed to some type of apportionment (i.e. division, sharing) of financial obligations (i.e. expenses, costs, or losses). A court cannot alter or destroy the clear meaning and intent of the parties as expressed in the unambiguous language of their written contract, because that would create a different contract for them. Thus, were the Court to adopt St. Mary's interpretation of the Agreement, it would essentially be deleting the term "losses" from Paragraph 10 and creating a contract different from the one the parties agreed to.

### ORDER DENYING CROSS SUMMARY JUDGMENT MOTIONS BY PHOENIX AND ST. MARY'S AND GRANTING IPCO'S MOTION FOR SUMMARY JUDGMENT

Phoenix contends it is relying on the express language of Paragraph 10 as the basis of its breach of contract claim. Having reviewed Paragraph 10, however, the Court cannot hold as a matter of law that St. Mary's breached Paragraph 10 of the Agreement by failing to pay 50% of the venture's operating losses. Nowhere does the Agreement expressly define "losses" as operating losses, or expressly define "division" as requiring payment of 50% of the "losses." Nor does the Agreement provide a specific definition for "losses" or "division" as it relates to "losses" in Paragraph 10.

The term "losses" is subject to several reasonable meanings within the context of the Agreement, including, but not limited to, the venture's losses or the particular obligations of each party as specifically set forth in the Agreement. Furthermore, the Agreement does not provide a specific formula to establish the method through which the "losses" are to be calculated and "divided" equally or otherwise by the parties. Exhibit 1 only provides a formula by which Phoenix was to determine the equal division of the "venture profit" and was silent with respect to the equal "division" of "losses."  A reasonable person, thus, could interpret "venture profit" as including losses and conclude that Exhibit 1 would apply to both the sharing of profits and losses. However, a reasonable

person also could interpret the addition of the term "losses" in Paragraph 10 to require the division of something other than the venture's losses. It is, therefore, unclear whether Exhibit 1 applies to the division of "losses" as contemplated in Paragraph 10. While the paragraphs that precede Paragraph 10 establish a specific apportionment of costs/expenses among the parties, Paragraph 10 fails to provide such specificity when referring to the "division" of "losses." "Division" of "losses," therefore, could require a party to make a payment of a set sum to the other party, or might require a party to credit or absorb the monies owed to it under the Agreement. From all of this, the Court concludes that the Agreement is ambiguous as to the meaning of "losses" and "division" as it relates to "losses" in Paragraph 10.

If a court concludes that ambiguity exists in a contract, ultimate resolution typically will turn on parties' intent. Id. In searching for the intent of the parties, the court must examine the instrument in its entirety. Columbia Gas v. NeMours, 217 S.E.2d 919 (W.Va. 1975). Exploring the intent of contracting parties also often involves gathering and reviewing facts extrinsic to language of the contract document and then superimposing reasonable inferences extractable from the facts on the ambiguous words to

ORDER DENYING CROSS SUMMARY JUDGMENT MOTIONS
BY PHOENIX AND ST. MARY'S AND GRANTING IPCO'S
MOTION FOR SUMMARY JUDGMENT

reveal the parties' intent. <u>FOP, Lodge Number 69 v. City of Fairmont</u>, 468 S.E.2d at 716 n.7.

Prior contemporaneous parol statements may not be admitted to vary written contracts, but may be admitted to explain uncertain, incomplete, or ambiguous contract terms. <u>Poling v. Pre-Paid Legal Services, Inc.</u>, 575 S.E.2d 199 (W.Va. 2002). Specifically, parol evidence is admissible to show the situation of the parties, the surrounding circumstances when the writing was made, and the practical construction given to the contract by the parties themselves either contemporaneously or subsequently. <u>Id.</u> If the parol evidence is not in conflict, the court must construe the writing, but if the parol evidence is conflicting on a material point necessary to interpretation of the writing, then the question of its meaning should be left to the jury under proper instructions. <u>Id.</u>

The parties are asking the Court to declare their intention by looking only within the four corners of the contract, but their views of their intentions are at polar opposites based on the same contract language. Because the Agreement between Phoenix and St. Mary's is ambiguous with respect to the terms "losses" and "division", these terms must be considered in the context of the

**ORDER DENYING CROSS SUMMARY JUDGMENT MOTIONS
BY PHOENIX AND ST. MARY'S AND GRANTING IPCO'S
MOTION FOR SUMMARY JUDGMENT**

parties' dealings with one another and performance of their duties under the Agreement so that the parties intent with respect to those terms may be enforced.

According to Phoenix, St. Mary's produced invoices for direct costs and processing fees from which it deducted and reflected as a credit toward its direct costs 50% of the venture's losses. It claims, therefore, that St. Mary's paid some but not all of the venture's losses through this deduction and that these deductions establish that St. Mary's understood the parties had agreed to share the venture's losses. Phoenix also asserts that Phoenix and St. Mary's exchanged financial information ultimately reflected in the Profit and Loss Statements required by Paragraph 10 of the Agreement, and that St. Mary's never disputed the accuracy of any statement or requested an audit. It further states that these monthly statements set forth the "losses," their components, and the resulting amounts to be shared by the parties. Thus, Phoenix asserts that the intent of the parties was to equally share the "venture profit", which it claims includes both profit and losses.

St. Mary's contends that Phoenix never invoiced or otherwise requested that St. Mary's pay its alleged 50% share of the venture's losses, but sent payments to St. Mary's as the venture

### ORDER DENYING CROSS SUMMARY JUDGMENT MOTIONS BY PHOENIX AND ST. MARY'S AND GRANTING IPCO'S MOTION FOR SUMMARY JUDGMENT

incurred losses. It asserts that it only credited 50% of the losses, as reflected on the Profit and Loss Statement compiled by Phoenix, to amounts owed by Phoenix/ IPCO so that it could receive its full 50% share of each period's profits, when profits were ultimately achieved, without having to make any adjustment for prior period losses. St. Mary's, therefore, contends that "division" of "losses" as contemplated by Paragraph 10 only required crediting of monies owed by the other parties to it under other paragraphs of the Agreement.

With respect to the Profit and Loss Statements, St. Mary's concedes that the statements accurately reflect the "venture profit"; however it contends that the statements do not accurately show the particular financial obligations among Phoenix, IPCO, and St. Mary's. Furthermore, St. Mary's asserts that it did not object to the statements because they showed only a division of "venture profit" as determined by the formula agreed to by the parties in Exhibit 1 and was silent to a division of losses.

The record establishes that material facts are in dispute regarding the parties' intent concerning the "division" of "losses" under the Agreement. Therefore, a jury will have to determine the definition of "division" and "losses", based not only on the terms

17

**ORDER DENYING CROSS SUMMARY JUDGMENT MOTIONS
BY PHOENIX AND ST. MARY'S AND GRANTING IPCO'S
MOTION FOR SUMMARY JUDGMENT**

of the Agreement but also on the actions taken by the parties under the Agreement. The Court, therefore, denies Phoenix's motion for partial summary judgment and St. Mary's motion for summary judgment with respect to the interpretation of contractual issues.

**2.  Estoppel**

Phoenix maintains that St. Mary's not only never contested the amounts set forth as income, costs, and expenses incurred or paid in the Profit and Loss Statements, but by its actions during the venture actually acquiesced in and admitted those amounts. Specifically, it alleges that St. Mary's paid part of its share of the losses by deducting or crediting half of the losses against amounts owed to St. Mary's by Phoenix and IPCO under the Agreement, and that St. Mary's concealed the reasons it now asserts for deducting 50% of the losses from the monies owed by it to Phoenix and IPCO. Phoenix further asserts that it relied on St. Mary's actions to its detriment in continuing to advance funds for and sustain losses with respect to the venture, and that St. Mary's, therefore, should be estopped from contesting its half share of the venture's losses.

St. Mary's contends that Phoenix's contract claim also is estopped because Phoenix permitted the venture to continue after it

### ORDER DENYING CROSS SUMMARY JUDGMENT MOTIONS
### BY PHOENIX AND ST. MARY'S AND GRANTING IPCO'S
### MOTION FOR SUMMARY JUDGMENT

experienced a loss, despite the termination clause in Paragraph Four requiring termination of the venture within 30 days after any quarter in which a loss was incurred unless the parties otherwise agreed. Furthermore, St. Mary's asserts that Phoenix failed to request that St. Mary's make payments for half of the venture's losses during the life of their business venture, and that Phoenix's failure to do so led St. Mary's to adjust the amount of the monies owed by Phoenix and IPCO to it and continue with the venture, despite its losses.

When one party purposely induces another party to act to his detriment by words, conduct or silence, the doctrine of estoppel provides that the inducing party should not be allowed to change its position that caused the action by the other party. Potesta v. USF&G, 504 S.E.2d 135, 143 (W.Va. 1998). Estoppel is properly invoked to prevent a litigant from asserting a claim or a defense against a party who has detrimentally changed its position in reliance upon the litigant's misrepresentation or failure to disclose a material fact. Id. at 143-144. The focus of the doctrine of estoppel is on the party seeking its application. Id. The party who seeks benefits from the doctrine of estoppel has the burden of proving it.

### ORDER DENYING CROSS SUMMARY JUDGMENT MOTIONS
### BY PHOENIX AND ST. MARY'S AND GRANTING IPCO'S
### MOTION FOR SUMMARY JUDGMENT

With respect to their respective claims of estoppel, Phoenix and St. Mary's each have the burden to prove: (i) that the estopped party concealed its position about the contractual responsibility for project losses when that position could and should have revealed; (ii) that the it otherwise had no reasonable means to know of the other estopped party's position; (iii) that the estopped party intended and reasonably expected it to rely on the concealment of the estopped party's position; and (iv) that it did reasonably rely on the concealment to its detriment. See Id. Proof of estoppel must be clear. Id.

Neither of the parties here can prevail as a matter of law on their estoppel arguments because material facts are in dispute as to whether one or the other concealed its position about the "division" of "losses" and intended and reasonably expected the other party to rely on the concealment of its position. Phoenix and St. Mary's each contend that they fulfilled their respective responsibilities and took action pursuant to the terms of the Agreement. Each denies any concealment of its true position and claims its actions were made in reliance on its understanding of the Agreement and in reliance on the other party's actions. The parties' estoppel arguments, thus mirror their parol evidence

**ORDER DENYING CROSS SUMMARY JUDGMENT MOTIONS
BY PHOENIX AND ST. MARY'S AND GRANTING IPCO'S
MOTION FOR SUMMARY JUDGMENT**

arguments in support of their interpretation of the Agreement. Accordingly, there are factual questions relating to the issue of estoppel that preclude disposing of the case on the parties' motions for summary judgment, and the Court **DENIES** Phoenix and St. Mary's motions for summary judgment as they relate to the issue of estoppel.

**3.  Waiver**

Phoenix maintains that, in the course of the parties' communications concerning the Profit and Loss Statements compiled by Phoenix pursuant to Paragraph 9 of the Agreement, St. Mary's waived the right to dispute Phoenix's interpretation of those statements as presented in this case.  Although the doctrines of both waiver and estoppel are grounded in equity, they differ significantly in their application.  Potesta v. USF&G, 504 S.E.2d at 142-43.  "The doctrine of waiver focuses on the conduct of the party against whom the waiver is sought, and requires that party to have intentionally relinquished a known right."  Id.  To prove a waiver, the party claiming the benefits of the waiver has the burden to prove by clear and convincing evidence that the adverse party intentionally relinquished a known right.  Id.

### ORDER DENYING CROSS SUMMARY JUDGMENT MOTIONS BY PHOENIX AND ST. MARY'S AND GRANTING IPCO'S MOTION FOR SUMMARY JUDGMENT

Like the parties' estoppel claims, Phoenix's waiver claim fails on summary judgment because disputed material facts exist concerning the parties intent in performing their duties and fulfilling their financial obligations under the Agreement. Therefore, the Court **DENIES** Phoenix's motion for summary judgment on the issue of waiver.

### 4.  Judicial Estoppel

The Court next turns to the claims of St. Mary's that positions taken by Phoenix in prior litigation preclude it from arguing that St. Mary's is responsible for half of the venture's losses. Prior to suing St. Mary's, Phoenix sued Horn Brothers Oil Company and Nationwide Insurance Company in two civil actions (collectively "the Horn litigation") in West Virginia state court. According to St. Mary's, Phoenix took the position in the Horn litigation that, but for the improper conduct of Horn, the venture would have been profitable. It specifically contends that, in the Horn litigation, Phoenix asserted that Horn Brothers was responsible for all of the venture's losses for which Phoenix now seeks payment from St. Mary's. It also contends that Phoenix took the position in the Horn litigation that Horn Brothers' trade debt to Phoenix and IPCO was uncollectible, and that any recovery on

### ORDER DENYING CROSS SUMMARY JUDGMENT MOTIONS
### BY PHOENIX AND ST. MARY'S AND GRANTING IPCO'S
### MOTION FOR SUMMARY JUDGMENT

behalf of Horn Brothers was a recovery of the project losses. Accordingly, St. Mary's contends that Phoenix is judicially estopped from now attempting to collect half of the venture's losses from St. Mary's.

"Parties will not be permitted to assume successive inconsistent positions in the course of a suit or a series of suits in reference to the same fact or state of facts." Syl. pt. 2, <u>Dillon v. Board of Educ. of Mingo County</u>, 301 S.E.2d 588 (W.Va. 1983). However, the doctrine of judicial estoppel is "an extraordinary remedy that should be invoked only when a party's assertion of a contrary position will result in a miscarriage of justice and only in those circumstances where invocation of the doctrine will serve its stated purpose." <u>WVDOT v. Robertson</u>, 618 S.E.2d at 514 (quoting <u>Puder v. Buechel</u>, 828 A.2d 957, 965 (N.J. 2003)).

The policies underlying the doctrine of judicial estoppel include preventing internal inconsistency, precluding litigants from playing fast and loose with the courts, and prohibiting parties from deliberately changing positions to serve their various interests when different issues arise during litigation. <u>Id.</u> at 514 n. 19. The application of judicial estoppel must be determined on

23

### ORDER DENYING CROSS SUMMARY JUDGMENT MOTIONS BY PHOENIX AND ST. MARY'S AND GRANTING IPCO'S MOTION FOR SUMMARY JUDGMENT

a case-by-case basis, and must not be applied to impede the truth-seeking function of the court. Id. (citing Cothran v. Brown, 592 S.E.2d 629, 632 (S.C. 2004)).

The party seeking to have a court apply the doctrine of judicial estoppel must establish the following: (1) The party assumed a position on the issue that is clearly inconsistent with a position taken in a previous case; (2) the positions were taken in proceedings against the same adverse party; (3) the party taking the inconsistent positions received some benefit from his or her original position; and (4) the original position misled the adverse party so that allowing the estopped party to change his or her position would injuriously affect the adverse party and the integrity of the judicial process. Syl. pt. 2, WVDOT v. Robertson, 618 S.E.2d 506 (W.Va. 2005).

Crucial to utilizing the doctrine of judicial estoppel is evidence of an inconsistent position in a prior legal proceeding. Here, the record does not establish that Phoenix is taking a position in the present matter that is inconsistent with prior positions taken by it in the Horn Litigation. In count one of the complaint, for example, Phoenix alleges that St. Mary's is contractually obligated to pay half of the venture's losses

**ORDER DENYING CROSS SUMMARY JUDGMENT MOTIONS
BY PHOENIX AND ST. MARY'S AND GRANTING IPCO'S
MOTION FOR SUMMARY JUDGMENT**

pursuant to Paragraph 10 of the Agreement. Simply put, Phoenix is asserting a breach of contract claim against St. Mary's. Phoenix's position in the present matter arises solely from the Agreement language in Paragraph 10 and seeks only damages provided for in Paragraph 10 of the Agreement. Horn was a trade account of the venture and was never a party to the Agreement at issue in this litigation. Phoenix, therefore, did not assert a breach of contract claim, but rather asserted a collection claim, as well as fraud and defamation claims against Horn Brothers in the prior litigation.

Accordingly, Phoenix's position in the prior litigation was that Horn's failure to pay the debts incurred on its trade account caused the venture to incur losses. In the present matter, Phoenix does not allege that St. Mary's caused the venture's loss, but rather asserts that it is contractually obligated under Paragraph 10 of the Agreement to make payment for half of the venture's losses. Paragraph 10 states that profit and losses will be divided equally between SMRC and Phoenix/IPCO without reference to the cause of the losses. Therefore, the cause of the losses is irrelevant with respect to Phoenix's breach of contract claim based on Paragraph 10 of the Agreement. Phoenix's prior position in the

Horn Brother litigation, thus, is not inconsistent with its position in the present matter.

St. Mary's judicial estoppel argument, however, does apply to the claims made by Phoenix in count three in which Phoenix seeks additional damages resulting from various alleged breaches by St. Mary's of its duties under the Agreement. Phoenix alleges that St. Mary's failed to adequately perform its responsibilities under the Agreement as set forth in Paragraph Four of the Agreement. It also alleges that, by refusing to pay its equal share of the losses, St. Mary's has also breached the duty to cooperate in the winding down of the parties' venture in a prompt fashion as required by Paragraph 13 of the Agreement, and has caused direct and substantial losses to the venture and to Phoenix. Phoenix further asserts that St. Mary's failure to pay its contractual sums caused Phoenix's insolvency and need to file bankruptcy. In count three, Phoenix is, therefore, seeking damages above St. Mary's purported 50% share of the venture's losses because Phoenix claims that St. Mary's actions directly caused such losses. This position would be inconsistent with the position taken by Phoenix in the Horn Litigation where it claimed that Horn Brothers was the <u>sole</u> cause of the venture's loss.

Nevertheless, in its motion for partial summary judgment and in its response to St. Mary's motion for summary judgment, Phoenix stated that it does not intend to pursue a claim for consequential damages. Furthermore, counsel for Phoenix confirmed during oral argument on these motions that his client only intends to use the allegations asserted in count three as a shield of affirmative defenses, claimed offsets or other limitations to SMRC's allegations to reduce any monies because of any alleged breach, misconduct or operational matters by Phoenix and IPCO. Phoenix will not be asserting those allegations as a sword to recover damages from St. Mary's over and above the alleged contract damages arising from Paragraph 10. Therefore, because Phoenix's position in this litigation is not inconsistent with positions taken in the Horn litigation, the Court concludes that judicial estoppel does not apply in this matter.

**5. Pre-Judgment Interest**

Phoenix also seeks summary judgment that St. Mary's is liable to Phoenix for applicable interest on the unpaid amount from the date accrued at the rate of 10% per annum. Under West Virginia law, in a contract action, a claimant is entitled to have the jury instructed that interest may be allowed on the principal due, but

### ORDER DENYING CROSS SUMMARY JUDGMENT MOTIONS
### BY PHOENIX AND ST. MARY'S AND GRANTING IPCO'S
### MOTION FOR SUMMARY JUDGMENT

is not entitled to the mandatory award of interest provided by West Virginia Code Section 56-6-31 because such section does not apply when interest is otherwise provided by law. Rice v. Community Health Association, 40 F. Supp.2d 788 (S.D. W.Va. 1999); Thompson v. Stuckey, Syl. Pt. 4, 300 S.E.2d 295 (W.Va. 1983); City Nat'l Bank of Charleston v. Wells, 384 S.E.2d 374 (W.Va. 1989). West Virginia Code Section 56-6-27 states:

> The jury, in any action founded on contract, may allow interest on the principal due, or any part thereof, and in all cases they shall find the aggregate of principal and interest due at the time of the trial, after allowing all proper credits, payments, and sets-off; and judgment shall be entered for such aggregate with interest from the date of the verdict.

Phoenix cites Eriksen v. Morey, 923 F. Supp. 878 (S.D. W.Va. 1996), for the proposition that pre-judgment interest is mandatory with an award of compensatory damages. In Eriksen, the jury attributed the entire amount of compensatory damages to fraud and did not award any damages arising from the contract claim. Id. at 880. Therefore, W.Va. Code §56-6-31 was not preempted by W.Va. Code §56-6-27 in Eriksen because the plaintiff recovered the judgment only on the tort claim and not the contract claim.

Because Phoenix only asserts a contract claim, it must prove its entitlement to interest, as well as the appropriate rate, by

## ORDER DENYING CROSS SUMMARY JUDGMENT MOTIONS
## BY PHOENIX AND ST. MARY'S AND GRANTING IPCO'S
## MOTION FOR SUMMARY JUDGMENT

appropriate evidence as its contract claim falls solely under W.Va. Code §56-6-27. <u>Rice v. Community Health Ass'n</u>, 40 F.Supp.2d 788, 799 (S. D. W. Va. 1999) (citing W. Va. Code § 56-6-27). Therefore, the Court **DENIES** Phoenix's motion for summary judgment with respect to the issue of pre-judgment interest.

## B. Third-Party Defendant IPCO's Motion for Summary Judgment

The only claim asserted against IPCO is a contribution claim by third party plaintiff, St. Mary's. IPCO asserts that St. Mary's contribution claim fails as a matter of law because Phoenix does not seek to recover more than St. Mary's alleged percentage of contractual liability under the Agreement and St. Mary's cannot seek contribution against IPCO for its own independent liability.

The doctrine of contribution arises when persons who have a common obligation, either in contract or tort, are sued on that obligation and one party is forced to pay more than his pro tanto share of the obligation. <u>Dunn v. Kanawha County</u>, BOE, 459 S.E.2d 151 (W.Va. 1995). Accordingly, under a theory of contribution, a party can only obtain damages in the amount of the excess that the party has paid over his own share.

At the September 20, 2005 pre-trial conference, Phoenix's counsel stated that it does not intend to pursue any claim stated

29

in count three of its complaint, but will limit its use of that information to rebut or defend SMRC's allegations, affirmative defenses and claimed offsets or reductions due to any alleged breach, misconduct or operational matters by Phoenix and IPCO. Phoenix, furthermore, is not attempting to recover any share of the losses for which IPCO would be responsible under the terms of the Agreement. Therefore, St. Mary's liability to Phoenix solely arises from its alleged obligation under the Agreement and is independent of any contractual obligation of IPCO under the Agreement. Accordingly, there is no basis in law for St. Mary's to recover under a claim of contribution against IPCO in light Phoenix's representations to the court that it does not intend to seek any recovery from St. Mary's for anything above St. Mary's share of the venture's losses, or for any claims assigned by IPCO for its share of the losses. Any evidence of alleged misconduct on behalf of IPCO in performing its duties, therefore, would only serve as an affirmative defense to the amount of damages recoverable and would not in any way affect its contractual obligations as to the percentage of losses for which St. Mary's would be responsible to Phoenix.

## ORDER DENYING CROSS SUMMARY JUDGMENT MOTIONS
## BY PHOENIX AND ST. MARY'S AND GRANTING IPCO'S
## MOTION FOR SUMMARY JUDGMENT

In its response to IPCO's summary judgment motion, St. Mary's does not rebut IPCO's argument with respect to its contribution claim. Rather, it seeks a ruling from the Court that Phoenix's claims against St. Mary's are subject to any defenses arising from the conduct of IPCO. Apparently, St. Mary's wants to introduce evidence of IPCO's alleged misconduct in causing the losses to reduce the amount of St. Mary's alleged obligation to Phoenix.

St. Mary's relies on the Assignment executed by Phoenix and IPCO to support its contention that Phoenix should be subject to any claims or defenses arising from IPCO's conduct. The Assignment executed by Phoenix and IPCO states:

> IPCO, a Delaware Corporation ("Interpet"), for good and valuable consideration, receipt of which is hereby acknowledged, and intending to be legally bound hereby, confirms and agrees that it does assign and that it has assigned, transferred and set over absolutely to Phoenix Petroleum Co., a Pennsylvania corporation ("Phoenix"), all of Interpet's right title and interest in any profits, losses, causes of action, suits, receivables or accountings, arising from or relating to that certain Processing Agreement ("the Agreement"), dated August 11, 1995 among Phoenix, Interpet and St. Mary's Refining Company. This Assignment includes, but is not limited to, any such present, past, or future right or claim asserted or capable of assertion by Interpet or by any joint venture between Phoenix and Interpet against St. Mary's Refining Company.

### ORDER DENYING CROSS SUMMARY JUDGMENT MOTIONS
### BY PHOENIX AND ST. MARY'S AND GRANTING IPCO'S
### MOTION FOR SUMMARY JUDGMENT

IPCO agrees with St. Mary's that, to the extent its alleged misconduct is an issue in this matter, any responsibility for such conduct has been assigned to Phoenix pursuant to the Assignment.

In a traditional assignment situation, the assignor is routinely a party to a contract and assigns its contractual rights and obligations to an assignee who was a stranger to the contract and has no rights under the contract until after the assignment. Accordingly, the rights of an assignee are derivative rights taken from the assignor. The assignee cannot normally assert rights that the assignor did not have because an assignee stands in the same position as the assignor. Furthermore, the assignee gets no better rights than the assignor had, so any party to the contract can assert contractual defenses when claims are pursued by the assignee. See Cook v. Eastern Gas & Fuel Associates, 39 S.E.2d 321 (W.Va. 1946).

Here, however, Phoenix is not just an assignee, but also a party to the original contract. It, therefore, holds an independent right to bring a claim against St. Mary's for its alleged share of the venture's losses regardless of the Assignment. At the September 20, 2005 hearing, Phoenix's counsel stated that Phoenix was not proceeding under the assignment in filing this action, but was

### ORDER DENYING CROSS SUMMARY JUDGMENT MOTIONS
### BY PHOENIX AND ST. MARY'S AND GRANTING IPCO'S
### MOTION FOR SUMMARY JUDGMENT

asserting this action against St. Mary's under its own right which it holds as a party to the contract. Phoenix contends that it paid the claimed losses and therefore seeks recovery for itself from St. Mary's.

Phoenix's independent rights and the assigned rights of IPCO, however, arise from the same Agreement and are subject to the same defenses that also arise from the terms of the Agreement. Specifically, Paragraph Three of the Agreement recognizes Phoenix and IPCO's responsibilities as one and the same and does not expressly separate their responsibilities. Furthermore, Paragraphs Five and Six sets forth financial obligations running from Phoenix and IPCO to St. Mary's without any separation or division of the obligation between Phoenix and IPCO. Although its meaning is disputed, Paragraph Ten states that "[p]rofit and losses...will be divided equally between SMRC and Phoenix/Interpet..." But for the assignment between Phoenix and IPCO, IPCO could clearly have brought a claim based on the same arguments asserted by Phoenix in this action regarding Paragraph Four of the Agreement. Therefore, Phoenix's rights under the Agreement and rights under the Assignment are identical and subject Phoenix to any defenses

arising from Paragraph Three of the Agreement. Accordingly, the Court **GRANTS** IPCO's motion for summary judgment.

### C. Motion to Strike Affirmative Defenses

In its motion for partial summary judgment, Phoenix has asked this Court to strike various affirmative defenses asserted by St. Mary's in its answer. At the September 20, 2005 pre-trial conference, Phoenix withdrew its motion to strike with respect to St. Mary's affirmative defense no. 4 (Waiver) and affirmative defense no. 5 (Estoppel) because such defenses are factual theories based on disputed facts.

Federal Rule of Civil Procedure 12(f) permits a district court, on motion of a party, to "order stricken from any pleading any insufficient defense ...." "Before granting a motion to strike, a court must be convinced that there are no questions of fact, that any questions of law are clear and not in dispute, and that under no set of circumstances could the defense succeed." Clark v. Milam, 152 F.R.D. 66, 70 (S.D.W.Va. 1993).

Applying these principles, the Court **GRANTS** Phoenix's motion with respect to affirmative defense no. 1 (Failure to State a Claim), affirmative defense no. 2 (statute of limitations), affirmative defense no.3 (laches), affirmative defense no. 7

34

## ORDER DENYING CROSS SUMMARY JUDGMENT MOTIONS
## BY PHOENIX AND ST. MARY'S AND GRANTING IPCO'S
## MOTION FOR SUMMARY JUDGMENT

(indispensable party), and affirmative defense no. 10 (election of remedies, judicial estoppel, and res judicata) and **DENIES** its motion with respect to affirmative defense no. 6 (bar of negligence), affirmative defense no. 8 (offset by negligence, by breach or other conduct), and affirmative defense no. 9 (offset due to funds received in prior litigation).

### IV. CONCLUSION

For the preceding reasons, the Court **DENIES** Phoenix's motion for partial summary judgment, **DENIES-IN-PART** and **GRANTS-IN-PART** Phoenix's motion to strike affirmative defenses (dkt. no. 39), **DENIES** St. Mary's motion for summary judgment (dkt. no. 34), and **GRANTS** IPCO's motion for summary judgment (dkt. no. 36). It **ORDERS** that the defendant, IPCO, be and it is **DISMISSED WITH PREJUDICE** from this action.

The Clerk is directed to transmit copies of this Order to counsel of record.

DATED: December _____*23*_____, 2005.

IRENE M. KEELEY
UNITED STATES DISTRICT JUDGE